LOBRANO, Judge.
Defendant, Raymond Bairnsfather, was charged by bill of information with aggravated crime against nature upon his niece, K.W., a violation of La.R.S. 14:98.1.[1]
Defendant was tried on November 27th and 28th, 1989 by a twelve-member jury and was found guilty of the lesser offense of crime against nature. On December 1, 1989, defendant was sentenced to five (5) years at hard labor.[2] FACTS:
K.W. was eight years old at the time the crime was committed. She lived with her mother, M.W., a younger brother, and her mother’s boyfriend, G.D. During the latter part of 1988, defendant, K.W.’s uncle, moved in with the family. M.W. and G.D. worked at a theatre on Airline Highway. Defendant was employed as a janitor at a movie theatre on Elysian Fields.
On the day of the crime, G.D. brought K.W. and her brother to the theatre where defendant was employed. Defendant left K.W.’s brother at the theatre and took K.W. to a local Burger King for lunch. After eating, defendant and K.W. went home. While K.W. was watching television, defendant told her to get on top of him. He then took out “his private part”. K.W. testified that defendant then pulled her pants down and began rubbing his “private part” against her “private part”. She stated that “white stuff” came out of his “private part”. Defendant then cleaned himself and K.W. K.W. testified that defendant then told her to put his “private part” in her mouth. She complied. K.W. did not tell anyone what happened because she was afraid she would “get into trouble”.
K.W.’s behavior and grades began to deteriorate. When G.D. began questioning her, K.W. told him what defendant had done. K.W.’s mother telephoned the child protection hotline which arranged for her to see a social worker. The social worker, in turn, arranged an appointment with the police.
*582 K.W. was brought to Charity Hospital where she was examined by Dr. Kurt Den-ninghoff. No physical signs of sexual abuse were found. However, Dr. Dennin-ghoff testified, “... She was remarkably upset, frightened, moreso [sic] than I had noticed with other children, ... I’ve never had a child respond to an examination this way who had not been violated, and I have examined thousands of children.”
Defendant was arrested on May 25,1989. He gave a taped statement to Detective Marlin Defilo, a portion of which was played at trial, in which defendant denied K.W.’s allegations and accused her of lying.
Defendant appeals his conviction and sentence asserting the following assignments of error:
1) The trial court erred in refusing to allow the defense to impeach the victim by showing her bad reputation for truth and veracity;
2) The trial court erred in refusing to allow the defense to impeach the victim with proof of prior inconsistent statements.
ASSIGNMENT OP ERROR 1:
Defendant asserts the trial judge erred by refusing to allow defense counsel to question Dale and Joann Konig, K.W.’s cousins, relative to K.W.’s reputation for truthfulness and veracity.
The following colloquy took place during the direct examination of the Konigs. DALE KONIG:
Q. “Okay. Have you discussed Kelly’s reputation with other members of the family in her community?
BY THE COURT:
Excuse me. What is this? EXAMINATION BY MR. RUSKIN:
Q. Are you familiar with—
BY THE COURT:
Are you talking about a child’s reputation?
BY MR. RUSKIN:
Yes, Mam.
BY THE COURT:
Well, if you want to put on reputation testimony, you cannot do that about that particular witness, you can only do that about your client, if that’s what you want to do. You want to put on character testimony about Kelly?
BY MR. RUSKIN:
That’s right, Your Honor.
BY THE COURT:
No. sir.
BY MR. RUSKIN:
About her credibility.
BY THE COURT:
No, sir. No, sir, that’s not going to be permissible.
BY MR. RUSKIN:
Reputation, community reputation.
BY THE COURT:
No, sir, that’s is not going to be rep— BY MR. RUSKIN:
A specific area.
BY THE COURT:
No, sir, that is not going to be permissible. This jury determines what they think about the credibility of the witness. If you want to put on reputation testimony about the defendant, that’s fine.
BY MR. RUSKIN:
I would like to note my objection for the record.”
JOANN KONIG:
Q. “To your knowledge, do you know— do you know Kelly real well?
A. Yes, I do.
Q. And, how long have you seen Kelly over the years?
A. Kelly and her mother and her brother lived with us twice. No, I take that back, once. And, then, she lived across the hallway of the apartment complex another time.
Q. Did you meet with Kelly often?
A. Yes, I did.
Q. In your apartment?
A. I baby sitted Kelly.
Q. Her mother trusted you with Kelly? A. I guess she did.
Q. She knew that Raymond was with you at that time?
*583 A. Yes.
BY THE COURT:
You keep on asking leading questions, Mr. Ruskin, and I’m not going to tell you again to stop it. Ask direct questions. EXAMINATION BY MR. RUSKIN:
Q. Do you know people who know Raymond real well?
A. Yes, I do.
Q. Do you know a lot of people who know Kelly real well?
A. Yes, I do.
Q. Now, during the summer after Kelly was — Kelly was staying was there a time during the summer when Kelly came to stay with you?
A. Yes, she was.
Q. And, how long was that during the summer?
A. She came like in the first week in June and I watched her up until the last week of June. So almost a month.
Q. And, did you — did there come a time when you stopped watching her?
A. Yes.
Q. Why did you stop—
BY MR. KELLY:
Objection, Your Honor, irrelevant.
BY THE COURT:
The objection’s sustained.
BY MR. RUSKIN:
Objection for the record, please, Your Honor.
BY THE COURT:
Let the objection be noted.
BY MR. RUSKIN:
The grounds for the objection, please? BY THE COURT:
It’s totally irrelevant.
EXAMINATION BY MR. RUSKIN:
Q. Did you observe Kelly from time to time while she was in your household? A. Yes, I did.
Q. Did she — what did you observe about the way she behaved?
BY MR. KELLY:
Objection, Your Honor, to the broad nature of the question—
BY THE COURT:
The objection’s sustained.
EXAMINATION BY MR. RUSKIN:
Did you observe her—
BY MR. KELLY:
Objection to the leading. EXAMINATION BY MR. RUSKIN:
Why is that a leading question?
BY THE COURT:
Well, you start off with “have you ever seen such and such and such.” You pack it all into one question. So, it’s a leading question.
EXAMINATION BY MR. RUSKIN:
Q. Did she get along with your children?
A. They’ve had spats and they’ve argued as most children do.
Q. Did you — did there come a time that you — that Kelly stopped staying there? There was a reason why she stopped staying there?
BY MR. KELLY:
Objection, Your Honor, it’s irrelevant. BY THE COURT:
It’s been asked before and it’s been already sustained, Mr. Ruskin.
BY MR. RUSKIN:
And, the grounds for that, Your Hon- or?
BY THE COURT:
Because it’s irrelevant.
BY MR. RUSKIN:
Objection for the record, Your Honor, once again.
BY THE COURT:
All been noted, Mr. Ruskin. EXAMINATION BY MR. RUSKIN:
Q. Now, the whole time Mr. Bairnsfa-ther, Raymond, here, was at your house, you never had problems. Have you ever known him to do anything like this that he has been accused of?
A. No.
Q. Ever?
A. No.
Q. Has anybody ever told — strike that. Do you believe that he did this?
BY MR. KELLY:
Objection—
BY THE WITNESS:
No, I don’t.
*584 BY MR. KELLY:
—Your Honor.
BY THE COURT:
Excuse me, what did you say?
BY MR. RUSKIN:
I'll withdraw the question. I'll withdraw.”
At the close of the trial, defense counsel made the following proffer as to the Ko-nigs’ testimony:
“Your Honor, the profer will be as to matters concerning the specific and reputation — specific incidents and reputation of statements on one hand and on the other hand, that the discussion of specific incidents witnessed by three of the witnesses at least three of the witnesses, Joann Konig, Dale Konig and Ms. Cindy Marin.
jfc }⅜ sfc * * *
... the facts regarding the witness’ truthfulness when she was talking with Ms. Marin and her impression of Kelly’s behavior while she was telling these stories and while the witness, Ms. Marin, caught Kelly in some specific lies and the way she tripped her up in discussing the incident; how Kelly reacted to that. Regarding Ms. Konig, Ms. Joann Konig, regarding the specific incidents — oh, and also from Ms. Marin, specific of theft involved in the household and that Ms. Kelly Wisterich was involved with. Also, thefts at the house of Ms. Joann Konig; also the reputation arrived at in the community where Ms. Kelly was involved in her ability to be a tatler; her ability to not be truthful and for making trouble in general, Your Honor, from the witness — from the three witnesses that I have already mentioned. And, also, Mr. —Officer Dale Konig, Your Honor. That evidence would have been brought out at trial, Your Honor.” (emphasis added).
Louisiana Code of Evidence Articles 607 and 608 provide as follows:
“Art. 607. Attacking and supporting credibility generally
A.Who may attack credibility. The credibility of a witness may be attacked by any party, including the party calling him.
B. Time for attacking and supporting credibility. The credibility of a witness may not be attacked until the witness has been sworn, and the credibility of a witness may not be supported unless it has been attacked. However, a party may question any witness as to his relationship to the parties, interest in the lawsuit, or capacity to perceive or to recollect.
C. Attacking credibility intrinsically.
Except as otherwise provided by legislation, a party, to attack the credibility of a witness, may examine him concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony.
D. Attacking credibility extrinsically. Except as otherwise provided by legislation:
(1) Extrinsic evidence to show a witness’ bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.
(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness’ testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.”
Art. 608. Attacking or supporting credibility by character evidence A. Reputation evidence of character.
The credibility of a witness may be attacked or supported by evidence in the form of general reputation only, but subject to these limitations:
(1) The evidence may refer only to character for truthfulness or untruthfulness.
(2) A foundation must first be established that the character witness is familiar with the reputation of the witness whose credibility is in issue. The character witness shall not express his personal opinion as to the character of the witness whose credibility is in issue.
*585 (3) Inquiry into specific acts on direct examination while qualifying the character witness or otherwise is prohibited.
B. Particular acts, vices, or courses of conduct. Particular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of crime as provided in Articles 609 and 609.1 or as constitutionally required.
C. Cross-examination of character witnesses. A witness who has testified to the character for truthfulness or untruthfulness of another witness may be cross-examined as to whether he has heard about particular acts of that witness bearing upon his credibility.” (emphasis added).
Pursuant to the language of the above Articles, it is clear that the credibility of a witness may be attacked by any party through the use of extrinsic evidence. It is equally clear, however, that such an attack must be preceded by the proper foundation. Furthermore, with respect to character evidence, inquiry into specific acts on direct examination while qualifying the character witness are specifically prohibited.
The trial court erred in concluding that defendant could not attack the credibility of the victim. Clearly, this ruling violated Article 607 of the Code of Evidence. However, we conclude that the result of the trial court’s ruling, i.e. to prohibit inquiry into the victim’s character reputation, was correct for other reasons.
A review of the record, and in particular the proffered information, convinces us that under the scenario of this case, the testimony sought by defendant would not establish a proper foundation to attack the victim’s reputation for truthfulness. It is clear that the questions directed to Joann Konig inquired as to specific acts of alleged untruthfulness which is clearly prohibited.[3] See also, Code of Evidence Article 405. Testimony with respect to a witness’ reputation for truthfulness should be preceded by establishing that the character witness knows or is familiar with that reputation. The character witness cannot merely relay incidents he or she had with the witness whose credibility is being attacked. There must be testimony by the character witness that will substantiate his own ability to express an opinion.
We find no merit in this assignment. ASSIGNMENT OF ERROR 2:
Defendant asserts the trial court erred in not allowing defense counsel to impeach K.W. with a prior inconsistent statement made to her neighbor, Cindy Marin, to the *586 effect that defendant had not molested her. See, Code of Evidence Article 607(D)(2). On cross examination, K.W. denied making this statement to Marin. During the direct examination of Marin, the following colloquy transpired:
Q. “Have you talked with Kelly next door about this case?
A. Yes, a lot.
Q. How often have you talked about this case?
A. She’s talked to me at least seven or eight different occasions about it.
Q. Starting about what time?
A. Two days after he was booked.
BY MR. FOSTER:
Objection, Your Honor.
BY THE COURT:
She said that they talked. When did it — when did you start talking with this child about this, you said?
BY THE WITNESS:
About a week after he was picked up for jail.
EXAMINATION BY MR. RUSKIN:
Q. Now, did this — did you discuss with her the particular facts about this case? A. Yes, I did. I asked her what happened.
Q. Was she forth — did she tell you what happened from—
BY MR. FOSTER:
Your Honor, I’m going to object. This is going to get into hearsay.
BY MR. RUSKIN:
No, Your Honor, this is not just hearsay.
BY THE COURT:
Just one second, Mr. Ruskin. Ask the question.
EXAMINATION BY MR. RUSKIN:
Q. Did she ever tell you whether or not anything had happened?
A. She had come to my door and twice — because I had made it a point to— BY MR. FOSTER:
Your Honor, I’m going to object if she’s going to say what she said.
BY THE COURT:
We have not yet heard — don’t tell us what she said or anything. She came to your door and what?
BY THE WITNESS:

She said, ‘He didn’t do me anything. He didn’t do me anything.’

BY MR. FOSTER:
Your Honor, that's hearsay and I object to the hearsay nature.
BY MR. RUSKIN:
Your Honor, this is — this is—
BY THE COURT:
You ask another question, Mr. Ruskin. Don’t elicit hearsay anymore now.
BY MR. RUSKIN:
Your Honor, this is not just hearsay. This is something—
BY THE COURT:
I just — I permitted it to go in. Ask another question.’’ (emphasis added).
Thus, it is clear from the record that Marin did testify to K.W.’s prior inconsistent statement. The trial judge did not admonish or instruct the jury in anyway to disregard the testimony. In fact, the court stated, “I permitted it to go in.”
There is no basis for defendant’s com-plaint.
This assignment of error is without merit.
For the foregoing reasons, defendant’s conviction and sentence are affirmed.
AFFIRMED.
BECKER, J., dissents.

. Defendant was also charged in a separate bill of information with two counts of molestation of a juvenile, No. 335-982. He pled guilty to both counts after being found guilty in the present case.

. The minute entry of July 26, 1989 does not show defendant entered a plea. Since defendant proceeded to trial without objecting, the court's failure to arraign the defendant is waived. C.Cr.Pro. Art. 555.

. Authors’ Notes (1) and (2) to Article 608, Handbook on Louisiana Evidence Law, Pugh, Force, Rault and Triche (1990 edition) states:
"(1) This Article deals solely with the attempt to attack or support the credibility of a witness by establishing that in general the witness is an untruthful or truthful person in the hopes that the jury will conclude that if the witness is generally untruthful it is more probable that he was untruthful on the witness stand. As amended by Senate Committee amendment to Senate Bill No. 155 of 1988, Paragraph A excludes opinion evidence that the witness is untruthful or truthful. The character witness testifying to a witness’s reputation for untruthfulness or truthfulness may not offer his own opinion as to the witness's character (subparagraph (A)(2), nor may he be asked about the witness’s specific acts illustrating untruthfulness or truthfulness (subpar-agraph (A)(3) and Paragraph B). (emphasis added)
(2) As a prerequisite to admissibility the proponent of the reputation testimony must establish as a foundation that the testifying character witness is 'familiar with the reputation’ of the witness whose credibility is to be attacked or supported. Although in most instances this foundation will be rooted in the conversations the testifying witness has heard about the truthfulness or untruthfulness of the earlier witness, it may well be that the testifying witness is ‘familiar with the reputation’ of the earlier witness because, having many mutual friends and associates with the earlier witness, he has never heard a bad word about his truthfulness. Assuming a proper foundation, a witness may express his evaluation (a form of opinion) as to the nature of a witness’ reputation for credibility, for example, whether the reputation is ‘good’, ‘very good’, ‘excellent’, etc. See Article 701. Generally, subpar-agraph (A)(2) is not intended to change former law. See State v. Frentz, 354 So.2d 1007 (La.1978). The reputation may exist within ‘any substantial community of people among whom he is well known, such as the group with whom he works, does business or goes to school.’ State v. Clark, 402 So.2d 684, 687 (La.1981).” (emphasis added)